1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL CASTRO, | ) | 1:10-cv-01092-AWI-SKO |
| | ) | |
| | ) | **FINDINGS AND RECOMMENDATIONS** |
| Plaintiff, | ) | **REGARDING PLAINTIFF'S SOCIAL** |
| | ) | **SECURITY COMPLAINT** |
| v. | ) | |
| | ) | (Doc. 1) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act").  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, and was referred to the Honorable Sheila K. Oberto, United States Magistrate Judge.  28 U.S.C. § 636; Local Rule 302(c)(15).

## FACTUAL BACKGROUND

Plaintiff was born in 1962, has a high school education, and has completed approximately one year of college;  Plaintiff previously worked as a janitor.  (Administrative Record ("AR") 28, 44.)  On March 31, 2006, Plaintiff filed an application for DIB, alleging disability beginning

December 10, 2005, due to carpal tunnel syndrome, tendinitis, and pain in his neck, shoulder, arm, elbow, forearm, wrists, hand, back, hips, knees, and ankles. (AR 67, 73.)

**A.    Medical Evidence**

On February 1, 2006, Plaintiff presented with a history of bilateral carpal tunnel syndrome to Dr. Robert M. Mochizuki. (AR 235-39.)  He complained of aching in both hands with sensory loss in his thumb, index, and middle finger of his right hand. (AR 235.)  Plaintiff related to Dr. Mochizuki that his condition was aggravated by repetitive hand use and indicated that the onset of the pain occurred while he was using a broken vacuum cleaner at work, holding it together as he performed his work activities.  As a result, his hand began to hurt on or around December 5, 2005. (AR 235.)  Dr. Mochizuki reported that Plaintiff underwent an electromyogram in December 2005 which demonstrated severe right carpal tunnel syndrome and a mild median neuropathy of the left hand. (AR 235.)  Dr. Mochizuki also noted that Plaintiff was treated by Dr. Jose L. Ibarra for carpal tunnel syndrome, and Plaintiff was provided with braces, prescribed Naprosyn, and was placed on light duty. (AR 235.)  Plaintiff had also been prescribed Vicodin and Ambien. (AR 235.)

Dr. Mochizuki assessed Plaintiff as having bilateral carpal tunnel syndrome, with the right hand and arm more symptomatic than the left; repetitive strain injury of the upper extremities; and extensor tenosynovitis of the right wrist and hand. (AR 238).  He recommended that the Naprosyn prescription be discontinued and that Plaintiff begin to take Daypro.  Plaintiff was precluded from repetitive grasping, pushing, and pulling activities with his upper extremities, and was scheduled for a right carpal tunnel release surgery. (AR 238.)  Dr. Mochizuki also reported that Plaintiff would be temporarily and totally disabled for two weeks after the surgery, followed by a period of light duty activity for six weeks.  He anticipated that Plaintiff would require physical therapy three times per week for three weeks; he stated that some permanent residuals were anticipated following surgery. (AR 238.)

On April 10, 2006, Dr. Mochizuki performed a right carpal tunnel surgical release on Plaintiff's right hand. (AR 393-94.)  Plaintiff returned for a follow-up examination on April 19, 2006. (AR 388.)  Dr. Mochizuki determined that Plaintiff was temporarily and totally disabled for three weeks and recommended physical therapy, which Plaintiff declined. (AR 388.)

On May 10, 2006, Plaintiff returned to Dr. Mochizuki for a follow-up examination. The treating note indicated that Plaintiff reported that he was experiencing aching of the dorsum of the right wrist and all of the radial side of the right wrist. (AR 381.) His symptoms were aggravated by wrist movement, but the sensation of the right upper extremities was improved. However, Plaintiff reported sensory loss of the left hand. Dr. Mochizuki observed that Plaintiff's right hand was tender to palpation of the dorsum of the right wrist, and there was tenderness to palpation of the extensor digitorum communis and the flexor carpi ulnaris. (AR 381.) Dr. Mochizuki recommended a left carpal tunnel release as well as an injection of the right wrist to alleviate some of the symptoms. (AR 381.)

On June 30, 2006, Plaintiff underwent both a left carpal tunnel release and an injection of the flexor carpi ulnaris tendon sheath and extensor digitorum tendon sheath. (AR 367.) On July 13, 2006, Plaintiff presented to Dr. Mochizuki for a follow-up examination. (AR 361.) Dr. Mochizuki stated that Plaintiff had a full range of motion in his left hand, and the sensory testing appeared normal. (AR 361.) Plaintiff was to complete a home exercise program, and was to return in three weeks for a follow-up examination. (AR 361.)

In July 2006, Plaintiff presented to Dr. Ibarra with complaints of right shoulder pain. (AR 275.) A magnetic resonance imaging ("MRI") scan was performed which demonstrated tendinosis of the rotator cuff as well as partial tearing. (AR 275.)

On August 3, 2006, Plaintiff presented to Dr. Mochizuki for a follow-up examination. (AR 358.) Plaintiff complained of pain in his right hand as well as pain around both his elbows. (AR 358.) On examination, Plaintiff had mild swelling of the right palm, but there was a full range of motion in both hands. (AR 358.) Sensory testing results were normal. (AR 358.) Dr. Mochizuki recommended a home exercise program, and again noted that Plaintiff declined physical therapy. (AR 358.)

On September 6, 2006, Plaintiff was again examined by Dr. Mochizuki. (AR 355.) Plaintiff presented with complaints of bilateral cervical spine pain, bilateral shoulder pain, and pain in his upper extremities from his elbows to his forearms and hands. (AR 355.) Dr. Mochizuki noted cervical spine tenderness as well as tenderness around the paracervical muscles, the rhomboids, the

1  trapezius, and all of the shoulder girdle muscles. (AR 355.) He also noted tenderness to palpation
2  of the triceps, biceps, and extensor musculature of the forearm. However, there was no obvious
3  swelling. (AR 355.) Plaintiff's right hand demonstrated very minimal swelling, but Dr. Mochizuki
4  observed there was tenderness when touching the thenar eminence. (AR 355.) In Plaintiff's left
5  hand, there was tenderness to palpation of the thenar eminence and around the area of the incision;
6  there was also tenderness to palpation of the volar forearm and the dorsum of the wrist. (AR 355.)
7  Dr. Mochizuki completed a physician activity status report indicating that Plaintiff could return to
8  work on September 7, 2006, but he was restricted to no repetitive lifting over five pounds and no
9  pushing or pulling over five pounds of force. (AR 513.) He noted that Plaintiff was unable to grasp
10 repetitively with the entire hand. (AR 513.)

11        On October 1, 2006, Plaintiff presented to Dr. Juliane Tran, a state examining physician, for
12 evaluation. (AR 282-86.) Dr. Tran reported that Plaintiff had back pain with possible chronic left
13 lumbar radiculopathy. (AR 285.) However, Plaintiff had a negative straight leg raising test, which
14 did not indicate acute left lumbar radiculopathy. (AR 285.) Plaintiff had a decreased left ankle
15 reflex, decreased lumbar range of motion with some abnormal sensory examination in the left lower
16 extremity in the left L5 dermatome. (AR 285.) With regard to his hands, Plaintiff had no muscle
17 atrophy, no loss of muscle strength, and the decreased sensation in both his hands was described as
18 non-specific. (AR 286.) Dr. Tran also reported that Plaintiff had probable fibromyalgia, "multiple
19 pain complaints and pain throughout the upper and lower extremities throughout the body with
20 multiple tender points palpated." (AR 286.) Dr. Tran opined that this was quite consistent with
21 fibromyalgia. Dr. Tran also noted that there was no evidence of a rotator cuff tear. (AR 286.)

22        Dr. Tran concluded that Plaintiff was restricted with lifting to no more than 25 pounds
23 occasionally and no more than 10 pounds frequently. Plaintiff was also restricted from activities
24 involving frequent left wrist movement, frequent bending, stooping, kneeling, or crouching. He was
25 restricted from standing or walking more than six hours a day. She did not find that Plaintiff had any
26 sitting restrictions, fingering or grasping restrictions, or restrictions related to overhead work,
27 climbing, balancing, or working with height restrictions. (AR 286.) She also determined that
28 Plaintiff had no visual or environmental restrictions. (AR 286.)

4

On October 11, 2006, Plaintiff was examined by Dr. Mochizuki who reported nearly identical findings as noted in September 2006. (AR 350.)

On October 20, 2006, non-examining state agency consultant Dr. A. M. Khong completed a physical residual functional capacity assessment of Plaintiff. (AR 288-92.) Dr. Khong opined that Plaintiff could (1) occasionally lift and/or carry and pull 20 pounds; (2) frequently lift and/or carry and pull 10 pounds; (3) stand and/or walk about six hours in an eight-hour work day; (4) sit for a total of about six hours in an eight-hour workday; and (5) push and/or pull an unlimited amount. (AR 289.) Although the form requested that the physician explain how and why the evidence supports the limitations listed, nothing was completed with regard to this. (AR 289.) Dr. Khong determined that, while Plaintiff could frequently stoop, he could only occasional climb, balance, kneel, crouch, or crawl. Plaintiff was limited in his ability to "handle," but no explanation as to why Plaintiff was "limited," was not provided. (AR 290.) Rather, Dr. Khong remarked that Plaintiff could perform no frequent handling with the upper left extremity. (AR 290.)

On November 28, 2006, chiropractor J. Greg Clark, D.C. completed a questionnaire regarding his observations of Plaintiff's limitations. (AR 296-97.) He provided a statement of Plaintiff's limitations: Plaintiff is precluded from any full-time work at any exertional level; he is able to sit up to four hours in an eight-hour workday; stand or walk for up to two hours eight-hour workday; use his hands to reach less than one-third of an eight-hour workday; push or pull up to five pounds; but can only handle up to five pounds, and he can do no grasping. (AR 297.)

On November 29, 2006, Plaintiff presented for a follow-up examination, and Dr. Mochizuki made nearly identical findings on examination as those reported in September 2006. (AR 345.) Plaintiff was given two refills of Vicodin. (AR 345.) In April 2007, Dr. Mochizuki completed another physician activity status report indicating that Plaintiff could return to work with no repetitive lifting over five pounds, no pushing and/or pulling over five pounds of force, and no reaching above the shoulders. (AR 509.)

On June 21, 2007, Plaintiff was examined by Dr. James L. Strait for the purposes of Worker's Compensation. (AR 453.) Dr. Strait reported that Plaintiff suffered from degenerative lumbar disc disease status post discectomy at L4-5; degenerative cervical disc disease; minor degenerative

thoracic disc disease; status post anterior cruciate ligament reconstruction, right knee; and normal examination of both ankles, both elbows, left knee, and both shoulders.  (AR 453.)  He also noted that Plaintiff had undergone bilateral carpal tunnel releases and was found to have compression of the median nerves at the time of surgery.  Dr. Strait stated that these impairments "would preclude [Plaintiff] from repetitive heavy lifting and repetitive heavy grasping with both hands."  (AR 455.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 53-62, 63-66, 72, 78.)

**1.      Plaintiff's Testimony**

On July 8, 2008, ALJ Stephen W. Webster held a hearing where Plaintiff testified that he lives with his daughter, completes a few household chores including washing dishes, light laundry, and dusting, and is able to attend to his personal grooming needs without assistance.  (AR 34-35.)  However, performing the household tasks cause his pain to increase.  (AR 34-35.)

Plaintiff testified that his hands are affected by carpal tunnel syndrome, and when he last attempted to work in May 2008 servicing vacuum cleaners, he only worked for nine days because he could not complete the work required.  (AR 37.)  He is also affected by fibromyalgia and tendinitis with the right hand worse than the left.  (AR 38-39.)  As he does not have any medical insurance, Plaintiff is treated by a chiropractor.  His pain is constant; he takes some medication; he can only sit for a half-hour at a time; he can stand for one hour at a time and he can walk for approximately one hour.  (AR 39-41.)  The heaviest thing he can lift is less than five to seven pounds. (AR 41.)  When Plaintiff lifts his arms over his head, it increases the pain in his shoulders, and he has difficulty picking up small objects with his fingers.  (AR 41.)  The longest he can use his hands for an activity such as typing is 30 minutes.  (AR 44.)  He wears braces on his hands and arms, which have been prescribed by a doctor.  The symptoms in his hands worsen despite the braces if his hands are used for long periods of time.  (AR 45.)

### 2.        Vocational Expert Testimony

A vocational expert ("VE") characterized Plaintiff's past work as a janitor as medium[1] and unskilled.  (AR 39-40.)  A hypothetical person of the same age and with the same education, language, and work experience as Plaintiff who could lift 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk six hours out of an eight-hour workday; occasionally bend, stoop, kneel, and crouch; occasionally do flexion and extension of the left lower extremity; do some overhead reaching; but could not do any overhead work would be precluded from performing Plaintiff's past relevant work.  (AR 47-48.)  However, such a hypothetical person could perform work as an ampoule sealer, a loader of semi-conductor dies, and a paper weight tester.  (AR 48.)

A second hypothetical person with the same restrictions as the first hypothetical person, but with the added restriction of no heavy lifting or repeated heavy grasping for the bilateral upper extremities, could also perform work as an ampoule sealer, a loader of semi-conductor dies, and a paper weight tester.

A third hypothetical person with the same restrictions as the first and second hypothetical persons but with the added restriction of having to be able to sit or stand at will would be able to perform work at the three categories of work identified in the first two hypotheticals.  The number of these jobs available, however, would be eroded by two-thirds due to the sit- and stand-at-will restriction.  (AR 49-50.)

A fourth hypothetical person of the same age and with the same education, language, and work experience as Plaintiff who could not complete a 40-hour a week job would be foreclosed from work in the national economy.  (AR 50.)

A fifth hypothetical person with the same limitations as the first hypothetical person and who is limited to only occasional use of the upper extremities for grasping, manipulation, and forward reaching would also be foreclosed from work in the national economy.  (AR 51.)

---

[1] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(b).

1    A sixth hypothetical person with the same limitations as the first hypothetical person who

2    could only occasionally use his hands for grasping and manipulation would also be foreclosed from

3    work in the national economy.  (AR 51.)

4        **3.    ALJ Decision**

5        On August 20, 2008, the ALJ issued a decision, finding Plaintiff not disabled since

6    December10, 2005.  (AR 9-18.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in

7    substantial gainful activity since the alleged onset date of December 10, 2005; (2) has an impairment

8    or a combination of impairments that is considered "severe" based on the requirements in the Code

9    of Federal Regulations; (3) does not have an impairment or combination of impairments that meets

10   or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) cannot

11   perform his past relevant work as a janitor; but (5) can perform alternative work as an ampoule

12   sealer, loader, and weight tester.  (AR 9-18.)  Plaintiff sought review of this decision before the

13   Appeals Council.  On April 9, 2010, the Appeals Council denied review.  (AR 1-5.)  Therefore, the

14   ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

15   **C.   Plaintiff's Contentions on Appeal**

16       On June 8, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's

17   decision.  In his opening brief, Plaintiff argues that ALJ erred by (1) improperly rejecting the opinion

18   of Dr. Mochizuki; (2) rejecting Plaintiff's testimony; (3) failing to find that Plaintiff's degenerative

19   disc disease is severe; and (4) finding that Plaintiff could perform alternative work given his

20   limitation for grasping.

21                        **SCOPE OF REVIEW**

22       The ALJ's decision denying benefits "will be disturbed only if that decision is not supported

23   by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

24   1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

25   of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

26   determine whether the Commissioner applied the proper legal standards and whether substantial

27   evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d

28   909, 911 (9th Cir. 2007).

1    "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*
2    *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such
3    relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
4    *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,
5    305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both
6    the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and
7    may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*
8    *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

9                                    **APPLICABLE LAW**

10       An individual is considered disabled for purposes of disability benefits if he is unable to
11   engage in any substantial, gainful activity by reason of any medically determinable physical or
12   mental impairment that can be expected to result in death or that has lasted, or can be expected to
13   last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),
14   1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or
15   impairments must result from anatomical, physiological, or psychological abnormalities that are
16   demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of
17   such severity that the claimant is not only unable to do his previous work, but cannot, considering
18   his age, education, and work experience, engage in any other kind of substantial, gainful work that
19   exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

20       The regulations provide that the ALJ must undertake a specific five-step sequential analysis
21   in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the
22   claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).
23   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment
24   or a combination of impairments significantly limiting her from performing basic work activities.
25   *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the
26   claimant has a severe impairment or combination of impairments that meets or equals the
27   requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*
28   §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

9

1    has sufficient residual functional capacity despite the impairment or various limitations to perform

2    her past work. *Id.* §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the

3    Commissioner to show that the claimant can perform other work that exists in significant numbers

4    in the national economy. *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or

5    not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v.*

6    *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

7                                          **DISCUSSION**

8    **A.    Weight Given to Dr. Mochizuki's Opinion**

9          Plaintiff asserts that the ALJ did not properly assess Dr. Mochizuki's opinion that Plaintiff

10   could perform no repetitive lifting over five pounds. (Plaintiff's Brief (Doc. 14), at 8-9.)  Plaintiff

11   contends that the ALJ rejected Dr. Mochizuki's opinion because the ALJ found it to be based on

12   Plaintiff's subjective complaints, and it was not consistent with the objective medical evidence.

13   Plaintiff argues these reasons are inadequate because Dr. Mochizuki treated Plaintiff frequently,

14   performed the carpal tunnel surgical releases on both of Plaintiff's hands, and continued to treat

15   Plaintiff repeatedly following these surgeries.  Plaintiff contends there is no basis for the assertion

16   that Dr. Mochizuki's opinions were predicated primarily on Plaintiff's subjective complaints; rather,

17   the record is replete with objective medical testing and procedures.  Plaintiff avers that no doctor's

18   opinion in the record conflicts with Dr. Mochizuki's assessment of Plaintiff's lifting limitation; thus,

19   the ALJ was required to adopt the opinion and it should now be credited as a matter of law by the

20   Court.

21         Defendant asserts that the ALJ reasonably concluded that Dr. Mochizuki's opinion was

22   predicated more on Plaintiff's subjective complaints than on objective medical findings.  Defendant

23   argues that Dr. Mochizuki's objective findings do not support his ultimate opinion regarding

24   Plaintiff's restriction on repetitive lifting; thus, Dr. Mochizuki's opinion was necessarily based more

25   on Plaintiff's subjective complaints of pain than on objective medical evidence.  (Defendant's

26   Opposition Brief (Doc. 15), at 8-11.)  Moreover, Dr. Mochizuki's opinion was not consistent with

27   Dr. Tran's and Dr. Strait's opinions that were more consistent with the medical record overall.

28

### 1.      Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.*  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.*  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).   The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

### 2.      Analysis

Plaintiff asserts that no examining or treating physician's opinion conflicts with Dr. Mochizuki's assessment of how much lifting Plaintiff remains able to perform, and thus the ALJ was required to adopt Dr. Mochizuki's opinion.  (Doc. 14, 9:4-5.)

Dr. Mochizuki opined that Plaintiff was restricted from repetitive lifting over five pounds and pushing and/or pulling five pounds of force.  (AR 509-13.)  In contrast, examining physician Dr. Tran opined that Plaintiff could lift up to 25 pounds occasionally and up to 10 pounds frequently.  (AR 286.)  Non-examining physician Dr. Khong opined that Plaintiff could occasionally lift, carry, and/or pull up to 20 pounds and could frequently lift, carry, and/or pull up to 10 pounds.  (AR 289.)  While not specifying specific weight limitations, Dr. Strait opined that Plaintiff was precluded from repetitive heavy lifting and repetitive heavy grasping.  (AR 455.)  Ultimately, these doctors' opinions are in conflict as to the *degree* of Plaintiff's limitation with regard to lifting, carrying, or pulling.

Thus, the ALJ was required to provide specific and legitimate reasons for rejecting the opinion of Dr. Mochizuki as to Plaintiff's limitation in this regard. *See Ryan*, 528 F.3d at 1198 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.").

The ALJ stated that no weight was given to the opinion of Dr. Mochizuki because it appeared that the opinion was based heavily on subjective allegations that were not fully credible and because it was not consistent with the objective medical evidence. (AR 16.)

A mere statement that a treating physician's opinion is not consistent with the objective medical evidence is not a specific or legitimate reason to reject that opinion. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim."). Defendant asserts that the ALJ found that Dr. Mochizuki's conclusions were not supported by his own treatment records. (Doc. 15, 9:4-6.) Defendant points to various findings made by Dr. Mochizuki that might suggest Plaintiff was not as limited in terms of repetitive lifting as Dr. Mochizuki indicated. Although many of Dr. Mochizuki's findings were recited by the ALJ (*see* AR 13-14), none of these findings was discussed in rejecting Dr. Mochizuki's opinion nor did the ALJ find that Dr. Mochizuki's opinion was unsupported by his own objective findings. With only a conclusory statement that Dr. Mochizuki's findings were "not consistent with the objective medical evidence," it is impossible to know what rationale or evidence underpinned the ALJ's conclusion. Reciting findings of a doctor and then reaching a conclusion leaves out the analysis which supports the ultimate determination. *Embrey*, 849 F.3d at 422 ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). A conclusion by itself is not conducive to judicial review, and the Court cannot create its own rationale or analysis, or adopt rationale or an explanation offered by the Commissioner post hoc, to determine whether the conclusion can be sustained.

The Court notes that in *Magallanes v. Bowen* the Ninth Circuit instructed that an ALJ does not need to recite magic words in rejecting a doctor's opinion, such as, "'I reject Dr. Fox's opinion

about the onset date because . . . '"; rather, a reviewing court is "not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion . . . if those inferences are there to be drawn." 881 F.2d 747, 755 (9th Cir. 1989).  In *Magallanes*, the court concluded that the ALJ's explanations for rejecting the opinion of a doctor were specific and legitimate because the ALJ had "summarized the facts and conflicting clinical evidence in detailed and thorough fashion, stating his interpretation and making findings." *Id*.

This case is distinguishable from *Magallanes* because here the ALJ made no interpretation of any of the medical evidence or how it might conflict.  There is no discussion as to how Dr. Mochizuki's findings were interpreted or what portions of it conflicted with particular objective evidence.  For example, while the ALJ recited that Dr. Mochizuki noted Plaintiff had a full range of hand motion and sensory testing was normal, the ALJ provided no discussion regarding how this conflicts with Dr. Mochizuki's opinion that Plaintiff was precluded from repetitive lifting over five pounds.  (AR 14.)  This is particularly problematic in light of the fact that Dr. Mochizuki continued to observe tenderness on examination after Plaintiff's carpal tunnel surgeries, and Dr. Strait observed in August 2007 that Plaintiff continued "to have abnormal nerve conduction velocity studies bilaterally in the medial nerves, greater on the right than the left." (AR 463.)  It is entirely unclear what objective medical evidence the ALJ found to be inconsistent with Dr. Mochizuki's opinion.

The ALJ also determined that Dr. Mochizuki's findings were predicated "heavily" on Plaintiff's subjective complaints, and because Plaintiff was not considered credible, the probative value of Dr. Mochizuki's opinion was diminished.  (AR 16.)  The ALJ's determination does not explain how the evidence indicated that Dr. Mochizuki's opinion was based more on Plaintiff's subjective complaints.  Although Defendant offers an explanation and rationale to support the ALJ's ultimate conclusion, this cannot form a basis to affirm the ALJ.  *See Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (court "cannot affirm the decision of any agency on a ground that the agency did not invoke in making its decision").

Moreover, Dr. Mochizuki made numerous objective findings regarding Plaintiff's hands and wrists as well as described his findings during surgery.  (*See* AR 393.)  In December 2005, Dr. Mochizuki stated that he reviewed findings from an electromyogram that Plaintiff underwent that

"demonstrated severe right carpal tunnel syndrome, and mild median neuropathy of the left hand." (AR 235.) He also explained that Plaintiff's "workup has included nerve conduction studies and x-rays." (AR 235.)  Following the surgical procedures, Dr. Mochizuki continued to provide care to Plaintiff, conducting physical examinations on several occasions, and reporting objective findings from neurological sensory testing as well as his own observations of Plaintiff upon physical examination. (AR 335, 350, 358, 361.)  For example, Dr. Mochizuki reported in October 2006 that, while there was minimal swelling and full range of right-hand motion, there was tenderness in Plaintiff's right hand when touching the thenar eminence.  (AR 350.)  With regard to Plaintiff's left hand, Dr. Mochizuki observed that it was tender to palpation of the thenar eminence and around the area of the incision, and he observed tenderness on palpation of the volar forearm and dorsum of the left wrist.  (AR 350.)

In *Ryan*, 528 F.3d at 1199-1200, the court explained that "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."  Dr. Mochizuki did not question Plaintiff's complaints of pain and his assessments of Plaintiff appear to be based on physical examinations, objective findings, and his own observations of Plaintiff.  Given the ALJ's lack of discussion regarding what factors led him to conclude that Dr. Mochizuki's opinion was heavily predicated on Plaintiff's subjective complaints, this rationale does not meet the requisite level of specificity.  It also appears to be inaccurate in that Dr. Mochizuki's opinion is supported by physical examinations and the doctor's own observations of Plaintiff's condition, not merely Plaintiff's subjective complaints.

Beyond this, the ALJ determined that Plaintiff was limited to "no repetitive grasping," but the substantial medical evidence that supports this specific limitation was supplied by Dr. Mochizuki, who provided a physician activity status report in September 2006 indicating that Plaintiff was "[u]nable to grasp repetitively with entire hand."  (AR 513.)  Yet, Dr. Mochizuki's opinion was assigned "no weight" by the ALJ.  (AR 16.)  Thus, if Dr. Mochizuki's opinion was assigned no weight, it is difficult to understand how his opinion with regard to repetitive grasping was seemingly adopted for purposes of the ALJ's RFC assessment.

14

Other medical evidence that the ALJ assigned significant weight indicated that Plaintiff was limited to no frequent handling with the left upper extremity.[2] (AR 290.) Even though this limitation is similar to that opined by Dr. Mochizuki, it was not the specific RFC limitation that the ALJ adopted nor was it among the specific hypothetical limitations that were posed to the VE.[3] Judicial review of the ALJ's assessment of Dr. Mochizuki's opinion is precluded when Dr. Mochizuki's opinion was simultaneously assigned "no weight" but appears to be credited for purposes assessing Plaintiff's limitation of "no repetitive grasping" without any sufficient explanation for the discrepancy.

Based on the foregoing, the reasons for assigning "no weight" to Dr. Mochizuki's opinion regarding Plaintiff's limitations were not specific and legitimate. "Such good faith errors inevitably will occur. Reasonable judicial minds sometimes will disagree regarding proper application of the rather imprecise standard of 'specific, legitimate' reasons." *Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1278 (C.D. Cal. 1996). "[U]nder the rule in *Lester*, the [medical] opinion will trigger benefits whenever the ALJ's previously stated reasons for rejecting the opinion fall short of the ill-defined 'specific, legitimate' standard." *Id.* (footnote omitted). "A reviewing court should have discretion to avoid this inequitable result by remanding the case for further administrative proceedings. Remand necessitates delay, but the cost of this delay should be balanced against the risk of an erroneous determination." *Id.*; *see also McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (remanding for further proceedings because Secretary of Health and Human Services was in better position than court to point to evidence in the record to provide specific, legitimate reasons to disregard treating physician's opinion). Accordingly, the Court recommends that discretion be exercised and the case be remanded to the Commissioner for further proceedings. *See McAllister*,

---

[2] Dr. Strait determined that Plaintiff was precluded from "repetitive heavy grasping" (AR 455), but Dr. Strait's opinion was only afforded "some weight" (AR 16). As the ALJ found that Plaintiff was precluded from all repetitive grasping, it appears that Dr. Strait's opinion was partially rejected in favor of Dr. Mochizuki's more limited "no repetitive grasping" limitation.

[3] Notably, each job that the VE identified as alternative work Plaintiff could perform required the ability to frequently handle. However, the inability to frequently handle, as opined by Dr. Khong (AR 290), was not the RFC limitation adopted (despite that Dr. Khong's opinion was assigned significant weight by the ALJ), nor was it posed to the VE in a hypothetical.

1  888 F.2d at 603 (holding that court may remand to allow ALJ to provide the requisite specific and

2  legitimate reasons for disregarding medical opinions).

3  **B.      The Agency Failed to Meet its Burden at the Fifth Step**

4         The parties dispute whether the limitation identified in the ALJ's RFC assessment for "no

5  repetitive grasping" precludes the alternative work identified by the VE that requires frequent

6  handling.  In essence, Plaintiff contends that jobs with a frequent or constant handling/grasping

7  physical component necessarily require repetitive grasping.  Defendant disputes that a limitation on

8  grasping is necessarily a limitation on handling.

9         Every job description in the Dictionary of Occupational Titles ("DOT") contains physical

10 demand components for that particular type of work.  Each job is assigned a strength component that

11 identifies the work as sedentary, light, medium, heavy, or very heavy.  Beyond the strength

12 component, there are 19 **other** specific physical demand components utilized in DOT job

13 descriptions that are defined in the "Selected Characteristics of Occupations Defined in the Revised

14 Dictionary of Occupational Titles (1993 ed.)" ("SCODICOT").  These 19 physical demand

15 components include the following: climbing, balancing, stooping, kneeling, crouching, crawling,

16 reaching, handling, fingering, feeling, talking, hearing, tasting/smelling, near acuity, far acuity, depth

17 perception, accommodation, color vision, and field of vision.  *See* SCODICOT APP C.  Each

18 description classifies the frequency with which a person performing that job would be required to

19 engage in a particular physical demand component.  There are four gradients of frequency: "not

20 present," "occasionally," "frequently," and "constantly."  SCODICOT APP C.  "Not present" means

21 that the activity or condition does not exist; "occasionally" means that the activity or condition exists

22 up to one-third of the time; "frequently" means that the activity or condition exists from one-third

23 to two-thirds of the time; "constantly" means that the activity or condition exists two-third or more

24 of the time.  SCODICOT APP C.

25        Here, the ALJ determined that Plaintiff was limited to "no repetitive grasping."  (AR 12.)

26 There is no physical demand component specifically for "grasping."  Rather, grasping is subsumed

27 under the definition of handling and the two are not differentiated by the SCODICOT or the DOT.

28

1 SCODICOT defines "handling" as "[s]eizing, holding, **grasping**, turning, or otherwise working with

2 hand or hands."  SCODICOT APP C (emphasis added).

3      The VE testified that a hypothetical person of the same age and with the same education,

4 language, and work experience as Plaintiff who could lift 20 pounds occasionally and 10 pounds

5 frequently; sit, stand, and/or walk six hours out of an eight-hour workday; occasionally bend, stoop,

6 kneel, and crouch; occasionally do flexion and extension of the left lower extremity; do some

7 overhead reaching; but could not do any overhead work was precluded from Plaintiff's previous

8 work, but could perform work in the categories of ampoule sealer, weight tester, and loader of semi-

9 conductor dies.  Pursuant to the DOT, work in the categories of ampoule sealer and weight tester

10 require frequent handling, i.e., from one-third to two-thirds of the time, and work in the category of

11 a loader of semi-conductor dies requires constant handling, i.e., more than two-thirds of the time.[4]

12      When the ALJ extended this hypothetical to add a limitation that precluded a person from

13 more than occasional grasping and manipulation, the VE testified that such a person would be unable

14 to perform any of the three identified jobs and would be precluded from "the world of work as

15 normally found in the national economy."  (AR 51.)  Thus, it appears that the VE considered

16 grasping to be an integral part of "handling," which is the only physical component that, by definition

17 in the SCODICOT, includes "grasping."  If grasping is not an integral component of handling, the

18 basis for the VE's testimony is eroded.  Further, it is incongruent to conclude that grasping is separate

19 action from handling given the SCODICOT definition of handling and the fact that grasping is not

20 a separate physical component in the DOT.  Finally, the medical opinion to which the ALJ assigned

21 significant weight stated that Plaintiff was limited to "no frequent handling" of the left upper

22 extremity.  (AR 290.)

23

24      [4] There appears to be some confusion with regard to jobs in the category of loader of semi-conductor dies.  The

25 VE identified the DOT number associated with this job category as "726.687-014."  (AR 48.)  However, **that** DOT number does not correspond with "loader of semi-conductor dies."  Rather, DOT number "726.687-014" corresponds

26 to work in the category of "plug wirer."  *See* DICOT 726.687-014, 1991 WL 679634.  The job category "loader of semi-conductor dies" corresponds to DOT number **726.687-030**, and this job **requires constant handling**.  *See* DICOT

27 726.687-030, 1991 WL 679637.  Both parties indicate that all three jobs identified by the VE require **frequent handling**.  (*See* Doc. 15, 14:2-3; Doc. 17, 2:18-19.)  This would be accurate if the VE's testimony related to jobs in the category

28 of "plug wirer," which requires frequent handling.  A closer examination of the DOT numbers indicates a mistake in the VE's testimony as to the DOT number for loader of semi-conductor dies.

1    The issue presented, therefore, is not whether "grasping" is part of the physical component

2    for "handling" (it is clear by the SCODICOT definition that it is), but rather how the frequency of

3    handling activities (which include grasping) identified by the SCODICOT equates and applies to the

4    ALJ's finding that Plaintiff is limited to "no repetitive grasping."  The VE was asked to testify about

5    a hypothetical person's ability to perform work when limited to **no more than occasional grasping**

6    rather than the ability to work when limited to "no repetitive grasping."  It may be inferred that the

7    ALJ posed this particular hypothetical because the ALJ equated "no more than occasional grasping"

8    with "no repetitive grasping."  On the other hand, if this were so, then the ALJ would necessarily

9    have had to conclude that Plaintiff was disabled at the Fifth Step given the VE's testimony that a

10   person who could do no more than occasional grasping and manipulation would be precluded from

11   the "world of work."  To avoid this ambiguity, the hypothetical should have been posed to the VE

12   in the same way as the ALJ phrased the limitation in the RFC assessment.  For a hypothetical to be

13   reliable and have evidentiary value, it must accurately reflect the claimant's limitations.  *Thomas*,

14   278 F.3d at 956; *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).

15       This particular language ambiguity was presented to the court in *Macapagal v. Astrue*, No.

16   C07-03706 HRL, 2008 WL 4449580, at *2-*4 (N.D. Cal. Sept. 29, 2008).  In *Macapagal*, the

17   plaintiff asserted that the ALJ's RFC finding did not accurately reflect the hypothetical posed to the

18   VE.  *Id.* at *2.  The plaintiff asserted this was so because the hypothetical to the VE contemplated

19   an individual capable of "'occasional typing with the left hand,' whereas the ALJ concluded that [the]

20   plaintiff [was] 'precluded from repetitive use of the left hand.'"  *Id.*  The VE testified that, given a

21   limitation for "occasional typing with the left hand," the jobs the VE identified, which all required

22   frequent handling, would be eroded by about two-thirds.  Thus, there would still be significant jobs

23   in this category that the plaintiff could perform, even with this limitation.  *Id.* at * 4.  The plaintiff

24   asserted that a preclusion from repetitive use of the left hand necessarily excluded occasional typing

25   with the left hand.  According to the plaintiff, because the hypothetical to the VE did not provide the

26   limitation for repetitive use of the left hand, the VE's testimony was rendered ambiguous.

27       The defendant in *Macapagal* asserted that a **preclusion** for repetitive use was not necessarily

28   inconsistent or exclusive of hand use characterized as frequent, i.e., one could perform an action

18

1  frequently but not necessarily repetitiously. *Id.* at *3. The Commissioner pointed to a medical

2  opinion that stated that the plaintiff could "perform frequent left handling and fingering," and argued

3  it was consistent with the ALJ's finding that the plaintiff was precluded from repetitive use of her

4  left hand. *Id.*

5      The court determined that the term "repetitive," in the context of hand use "seem[ed] to

6  describe the manner in which a person uses her hands and the type of action required, whereas the

7  term 'occasional' reflects how often a person uses her hands in a particular manner." Therefore, the

8  court reasoned that the hypothetical to the VE "suggest[ed] an individual who could use her left hand

9  occasionally, whereas the [ALJ] found that plaintiff should not use her left hand in a repetitive

10  manner at all, whether occasionally or frequently." *Id.* at *4. The court concluded that it could not

11  find that the ALJ's RFC determination that the plaintiff was precluded from repetitive use of the left

12  hand was consistent with the hypothetical to the VE which supposed an individual who could

13  occasionally type with the left hand. *Id*. at *4. The court ordered that the issue be clarified on

14  remand.

15      The court's reasoning in *Macapagal* is both persuasive and applicable to the facts of this case.

16  Here, the hypothetical posed to the VE supposed an individual who was limited to only occasional

17  grasping and manipulation. The ALJ's RFC for "no repetitive grasping" seems to indicate no

18  repetition of grasping, whether occasional, frequent, or constant. In other words, given that most

19  unskilled, sedentary jobs "require good use of the hands and fingers for repetitive hand-finger

20  actions" (*see* SSR 83-10, 1983 WL 31251, at * 5), each of the jobs identified by the VE could require

21  a person to frequently perform repetitive grasping. Additionally, it is worth noting that each of the

22  jobs identified by the VE are assigned an "R" component, which represents work that requires

23  "performing repetitive or short-cycle work." In this context, even occasional grasping might

24  constitute repetitious grasping, albeit on an occasional basis. Given this ambiguity, clarification is

25  required on remand. Without clarification, the VE testimony is ambiguous and the agency has not

26  met its burden at the Fifth Step.

27

28

**C.      Plaintiff's Credibility**

Because the Court recommends that this case be remanded for the reasons detailed above, the Court dispenses with an exhaustive analysis of the ALJ's credibility determination.  In light of the Court's finding that the ALJ failed to properly evaluate the opinion of Dr. Mochizuki, and because credibility determinations are inescapably linked to conclusions regarding medical evidence, 20 C.F.R. § 416.929, the ALJ's credibility finding should also be reversed and the issue remanded. After re-evaluating the medical evidence of record, the ALJ will be in a better position to evaluate Plaintiff's credibility.  The ALJ must do more than make general findings; rather, when evaluating a claimant's credibility, the ALJ "must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  On remand, the ALJ should properly assess Plaintiff's testimony and provide clear and convincing reasons for rejecting it should such a conclusion be warranted.

**D.      ALJ's Consideration of Plaintiff's Degenerative Disc Disease**

Plaintiff argues that the ALJ erred by finding that his degenerative disc disease was not a severe impairment at the Second Step of the sequential evaluation.  Plaintiff points out that a 2005 MRI indicates evidence of degenerative disc disease.  Treating notes from Plaintiff's chiropractor indicate that Plaintiff's back condition causes pain, limitations in sitting, standing, and walking and also results in Plaintiff having to lie down for several hours during the day.  (Doc. 14, p. 15-16.)

Defendant contends that, while the ALJ did not determine whether Plaintiff's degenerative disc disease was severe in the Second Step, the ALJ did consider all the limitations imposed by his back condition, which is reflected in the ALJ's RFC.  (Doc. 15, p. 13.)  For example, the ALJ determined that Plaintiff was limited to light work with numerous additional limitations including occasional bending, stooping, kneeling, and crouching, and a restriction on any heavy lifting or overhead work.  (Doc. 15, at 13.)  Defendant argues that Plaintiff has not established that his back condition limits him any further than the limitations assessed by the ALJ as part of the RFC.

At the Second Step of the sequential evaluation, the ALJ must determine whether a claimant suffers from a "severe" impairment, i.e., one that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520.  To satisfy this requirement, the claimant must

20

1   prove the existence of a physical or mental impairment by providing medical evidence consisting

2   of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will

3   not suffice. 20 C.F.R. §§ 404.1508, 404.1528. The fact that a medically determinable condition

4   exists does not automatically mean the symptoms are "severe," or "disabling" as defined by the

5   Social Security regulations. *See, e.g., Edlund v. Massanari*, 253 F.3d 1152,1159-60 (9th Cir. 2001);

6   *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

7           At the Second Step, the ALJ determined that Plaintiff had the following severe impairments:

8   bilateral carpal tunnel syndrom; bilateral shoulder derangement; and degenerative joint disease. (AR

9   11.)   The ALJ also found that Plaintiff has non-medically determinable impairments of multiple

10  aches and pains. (AR 11.)  The ALJ did not determine whether Plaintiff's degenerative disc disease

11  was a medically determinable condition or whether it was severe. So long as the ALJ considered all

12  of the limitations caused by this condition at later steps in the sequential evaluation, the fact that the

13  ALJ erred by not considering the condition at the Second Step is harmless. *See Burch v. Barnhart*,

14  400 F.3d 676, 682 (9th Cir. 2005) (concluding any error ALJ committed at the Second Step was

15  harmless because the step was resolved in the claimant's favor); *Lewis*, 498 F.3d at 911 (concluding

16  any failure to list bursitis as severe at the Second Step was harmless error where the ALJ considered

17  the functional limitations of bursitis at the Fourth Step).

18          However, as it is recommended that this case be remanded for other reasons, the ALJ can

19  make a finding at the Second Step of the analysis related to Plaintiff's degenerative disc disease.  As

20  Plaintiff's credibility will be reassessed on remand, the ALJ will once again have opportunity to

21  assess the limitations claimed as a result of this impairment and its combination with other

22  impairments.

23                             **CONCLUSION AND RECOMMENDATION**

24          Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial

25  evidence and is, therefore, RECOMMENDS that the ALJ's decision BE REVERSED and the case

26  be REMANDED to the ALJ to make additional findings.

27          These findings and recommendations are submitted to the district judge assigned to this

28  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fifteen (15)

days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    August 8, 2011**                           **/s/ Sheila K. Oberto**
                                                  UNITED STATES MAGISTRATE JUDGE